CUYAHOGA COUNTY BAR ASSOCIATION *v.* NEWMAN.

[Cite as *Cuyahoga Cty. Bar Assn. v. Newman,*
102 Ohio St.3d 186, 2004-Ohio-2068.]

(No. 2003–1529—Submitted December 3, 2003—Decided May 12, 2004.)

---

**Per Curiam.**

{¶ 1} Respondent, Joel Ivan Newman of Cleveland, Ohio, Attorney Registration No. 0038433, was admitted to the Ohio bar in 1972. On December 9, 2002, relator, Cuyahoga County Bar Association, charged respondent in a two-count complaint with having violated the Code of Professional Responsibility by representing both parties to a leasehold agreement. A panel of the Board of Commissioners on Grievances and Discipline considered the cause, making findings of fact, conclusions of law, and a recommendation.

{¶ 2} The panel found and evidence substantiates that since 1983, respondent had represented the client who would eventually lease the property in question, regularly assisting him in a wide variety of legal matters in his business and personal affairs largely on a pro-bono basis. In 1993, this client suffered a traumatic head injury in a traffic accident and, although hospitalized for nearly one year, he remained physically and mentally incapacitated as a result. The client was thereafter placed under guardianship. By 1994, the client's condition had improved, and respondent helped him terminate the guardianship. But because of the client's continued disability, respondent arranged in 1995 for the client's mother to serve as conservator for the client's financial affairs. The conservatorship lasted a little over one year.

{¶ 3} By 1997, respondent had also begun to represent an incorporated shopping center that owned a laundromat available for lease. In early June of that year, respondent presented to his disabled client the prospect of leasing the laundromat because the client was interested in a small business venture to operate. Respondent provided this client a copy of a 1995 corporate income tax return, from which the corporate name and address had been redacted, showing that the former proprietor of the laundromat had lost at least $3,000, not including $45,000 in depreciation. Respondent also told this client, whom he knew to be financially dependent on Social Security disability, that the shopping center's president would accept only the client's personal signature on the lease agreement.

{¶ 4} Respondent did not provide this client any other information about the viability of the laundromat, the prior tenant of which had gone out of business. Respondent did inform the client that he could have a two-month grace period to "test out" the business. At the panel hearing, respondent conceded that this term, not having been reduced to writing, would not have been enforceable.

{¶ 5} Shortly after respondent's proposal, the disabled client told respondent that he wanted to try running the laundromat. On July 1, 1997, respondent completed and signed the documents necessary for his client to establish a corporate structure for the laundromat, including a document that designated respondent as the statutory agent for the company. Respondent provided these services even though he had sent a letter to the disabled client on June 26, 1997,

advising him that he represented only the shopping center in the arrangements to lease the laundromat. And in a letter dated July 1, 1997, respondent confirmed this representation with the president of the shopping center.

{¶ 6} Also on or about July 1, 1997, the disabled client, in his personal capacity, and the president, on behalf of the shopping center, signed the lease, a security agreement, and an equipment sublease for the laundromat. Respondent acted in the transaction as counsel to the shopping center president, while the disabled client participated in the transaction without an attorney. Neither party to the lease expressly consented to respondent's representation relative to the potential conflict it presented. Moreover, although respondent recalled for the first time during the hearing that he had discussed the conflict with the disabled client and had urged him to obtain other counsel, the panel found that he had not. The panel relied on respondent's earlier deposition testimony, in which he had stated that he "certainly" had not told the client he needed separate counsel.

{¶ 7} The laundromat proved an unprofitable venture for the disabled client, and, in August or September 1997, he abandoned the business. In the months that followed, respondent, acting on the shopping center's behalf, prepared to sue the disabled client for payments due under the lease and equipment rental agreements, and the client retained other counsel for his defense. The shopping center later obtained a judgment against the disabled client for $38,822.25, and placed a lien on his house. The client was ultimately forced into bankruptcy.

{¶ 8} With respect to the misconduct charged in Count One (the lease negotiations and the representation of the shopping center in a lawsuit against the disabled client), respondent and relator stipulated and the panel found that respondent had violated DR 5–105(A) and (C) (barring attorneys from accepting professional employment for multiple parties where the clients' interests are obviously dissimilar, the clients have not consented after full disclosure, and the exercise of the attorney's independent judgment on any client's behalf is likely to be adversely affected). With respect to Count Two (respondent's representation of the shopping center in the lawsuit while he still had a professional relationship with the disabled client), the panel found that respondent had violated DR 7–101(A)(3) (barring attorneys from intentionally causing client damage or prejudice during the course of a professional relationship) inasmuch as he had abandoned his disabled client in negotiating the lease arrangements and then sued after the client defaulted.[1]

---

1. Respondent contends that the panel found a second, uncharged violation of DR 7–101(A)(3) in connection with Count One because it found violations of "DR 5–105(A), DR 5–105(C) and DR 7–101(A)(3) regarding Counts One and Two of the Complaint." We disagree because the panel, in the immediately preceding paragraphs, correctly specified the Disciplinary Rule violations that each count alleged.

{¶ 9} In recommending a sanction for this misconduct, the panel considered the mitigating and aggravating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline. The panel found that respondent had no prior disciplinary record, had been a committed and recognized volunteer in the Cleveland Legal Aid Society for many years, and had been active in numerous other civic and professional organizations, including relator's grievance committee. The panel also found mitigating that respondent had admitted the wrongfulness of his conduct; however, the panel was not convinced of respondent's remorse, and it inferred from his testimony that he had chosen for financial reasons to protect the interests of the shopping center over those of his disabled client.

{¶ 10} Initially, the parties jointly suggested a public reprimand. But after hearing all of the evidence, relator's counsel, while acknowledging the binding nature of the stipulation of a public reprimand, suggested that a six-month suspension would be more appropriate. The panel recommended a six-month suspension from the practice of law, all stayed.

{¶ 11} The board adopted the panel's findings of misconduct, but it modified the panel's recommendation. The board recommended, "based on the vulnerability of his victim and the resulting harm," that respondent's law license be suspended for one year, with six months of the suspension stayed. The board also recommended that respondent be required to reimburse the disabled client for the $1,500 he had expended to settle his predecessor's overdue water bill so that water service could resume at the laundromat.

{¶ 12} Respondent objects to the board's report, arguing that no clear and convincing evidence warrants the finding that he violated DR 7–101(A)(3) and intentionally damaged a client in the course of a professional relationship. Respondent first insists that he did not mean to harm his disabled client, whom he had represented for many years free of charge and considered a friend. He also claims that he withdrew from representing this client by sending his June 26, 1997 letter and, therefore, was not acting as the client's attorney in connection with the laundromat lease. We reject both arguments.

{¶ 13} Respondent's client has never recovered the aptitude for comprehension that he possessed before his head injury in 1993. His disability thus necessarily diminished his capacity to understand the significance of respondent's brief letter of withdrawal, and respondent knew or should have known this, given his familiarity with the client's condition, guardianship, and conservatorship. Respondent acknowledges his client's injury-induced lack of judgment, yet he still urges us to believe that he and his client discussed the withdrawal, conflict, and

need for independent counsel and that his client understood all of the implications of the situation.

{¶ 14} The panel and board implicitly found the client's and respondent's testimony on this fact unreliable, and we concur in this assessment. First, we cannot trust the client's recall in light of his disability, his genuine belief in the recollection notwithstanding. Second, respondent did not remember any cautionary discussion with his client until he heard the client testify about it. To the contrary, respondent at his deposition attested that he "certainly" had not advised the client to obtain another attorney. From this, we conclude that respondent did no more than direct a cursory correspondence to his client, which was obviously insufficient to generate this client's informed consent.

{¶ 15} Moreover, the combination of this client's disability and the other circumstances surrounding respondent's attempted withdrawal amply demonstrates that he abandoned his client's interests during the course of a professional relationship and caused, at least in part, the client's personal liability for defaulting on the 1997 lease. Respondent had a long history of representing this client in all kinds of actions, from divorce to real estate acquisitions, before the lease at issue, and he continued to represent the client in tax and other legal matters afterward. He also presented the prospect of leasing the laundromat to this client before notifying him in writing that he would not act as his attorney in the transaction. And as part of his proposal, respondent told the client that the lessor would accept only the client's personal signature on the lease, thereby exposing the disabled client to the liability that ultimately befell him.

{¶ 16} Respondent also prepared the papers needed to incorporate the laundromat, and he arranged for them to be signed on or about the same day the parties executed the lease, security agreement, and sublease. Plus, in setting up the corporate structure for the laundromat, respondent agreed to be the company's statutory agent for the purpose of accepting service of any complaint, an arrangement that graphically demonstrated the competing interests at stake. At the hearing, respondent conceded the possibility that had his disabled client not signed the lease and related documents in his personal capacity, respondent might have had to serve himself—as the statutory agent for the disabled client's corporation—with the complaint he prepared for the shopping center's suit.

{¶ 17} All of these factors—his client's disability, his having solicited the client about the laundromat lease despite the potential liability it presented, and his involvement in related matters before, during, and after the actual execution of the lease—are evidence that respondent's continued representation of and concomitant failure to appropriately protect his disabled client's interests caused the harm his client suffered. As relator argues, respondent's responsibilities to this disabled client extended far beyond providing a simple letter of withdrawal.

Under EC 7–8 (the aspirational supplement to DR 7–101), respondent should have exerted "his best efforts to insure that decisions of his client [were] made only after the client [had] been informed of relevant considerations." And here, the disabled client's need for separate counsel was obviously a relevant consideration, so that respondent should have "initiate[d] this decision-making process" when his client did not. Id. Moreover, respondent ignored the "additional responsibilities" generated by his client's impaired ability to make a considered judgment on his own behalf. EC 7–11 and 7–12.

{¶ 18} Based on the foregoing, we conclude that respondent specifically disregarded his disabled client's interests and exposed the client to avoidable financial ruin. We find that this conduct manifests his intent to cause the client damage or prejudice. Accordingly, we find that respondent violated DR 7–101(A)(3).

{¶ 19} Respondent also objects to the findings that he lacked remorse and that his disabled client's vulnerability and the harm the client suffered warranted the recommended sanction. As to respondent's remorse, we view the panel and board finding on this issue as reflecting their frustration with respondent's inability to fully appreciate the compromising position in which he placed his client. We share this frustration.

{¶ 20} Respondent has professed his remorse throughout these proceedings. However, he suggests that the troubles that befell his disabled client were the client's own doing. For instance, respondent argues that although he warned that he would be representing the lessor of the laundromat, not the disabled client, in the lease negotiations, *the client* decided not to retain his own attorney. Respondent also maintains that *the client* could have avoided the judgment taken against him by returning the keys to the laundromat during the two-month grace period. Finally, respondent observes that he could not have ethically contacted the disabled client after September 1997 because *the client* retained new counsel at some point thereafter, an argument that conveniently ignores respondent's own role in forcing the client to retain new counsel to defend himself against the suit that respondent was preparing to file.

{¶ 21} Thus, rather than finding a lack of remorse, we find that respondent has failed to appreciate the wrongfulness of his conduct. We consider this an aggravating factor. We accept as a commensurate sanction the recommended one-year suspension and six-month stay.

{¶ 22} In cases of conflicting interests where the attorney has actually preyed upon a client's economic distress, trust, and lack of sophistication, we have indefinitely suspended the attorney's license to practice law. *Columbus Bar Assn. v. Ewing* (1996), 75 Ohio St.3d 244, 661 N.E.2d 1109. On the other hand, when an attorney who had a history of professional misconduct represented multiple clients but risked only a potential conflict, we ordered a six-month

suspension. *Disciplinary Counsel v. Mazer* (1999), 86 Ohio St.3d 185, 712 N.E.2d 1246.

{¶ 23} Respondent did not commit his misconduct to take advantage of his disabled client, but it created an actual conflict of interest. Thus, we consider this case similar to *Toledo Bar Assn. v. Dzienny*, 96 Ohio St.3d 144, 2002-Ohio-3611, 772 N.E.2d 627, in which an attorney prepared inter vivos trusts for a client naming himself as a beneficiary but did so without any sinister motive pursuant to what he thought was a legitimate, if unusual, fiduciary arrangement. For this misconduct and because the attorney in *Dzienny* had committed a prior disciplinary infraction, but acknowledging his lack of corrupt motive, we suspended his law license for a period of 18 months, but stayed one year of the sanction on the condition that he commit no further misconduct.

{¶ 24} As respondent has no prior history of professional misconduct, we accept the recommendation of the board. Respondent is, therefore, suspended from the practice of law in Ohio for one year; however, six months of this sanction are stayed on the conditions that he commit no further misconduct and reimburse his disabled client for $1,500 within 90 days of this order. If respondent violates these conditions, the stay shall be lifted and respondent shall serve the entire one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

———————

Ellen S. Mandell, Bar Counsel, and Fred C. Crosby, for relator.

William T. Doyle, for respondent.